City of Chicago in Trust for the Use of Schools, Petitioner-Appellant, v. Albert J. Schorsch Realty Company, Inc., et al., Defendants,

Consolidated With

City of Chicago in Trust for the Use of Schools, Petitioner-Appellant, v. John Przywara, et al., Defendants-Appellees, Western National Bank of Cicero, etc., Defendant-Appellee.

Gen. No. 51,674.

First District, Fourth Division.

April 10, 1968.

Rehearing denied May 22, 1968.

James W. Coffey and Frank S. Righeimer, of Chicago (Frank S. Righeimer and Richard E. Girard, of counsel), for appellant.

Green, Murnighan & Kane, of Chicago (John B. Murnighan and John J. Jiganti, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Petitioner in eminent domain proceedings appeals from a jury award and judgment of $97,440 in favor of the owner of Parcel E—Western National Bank of Cicero, as Trustee under Trust No. 498. Defendant cross appeals from the denial of its motion to dismiss the complaint.

Petitioner instituted condemnation proceedings on March 4, 1965 (Circuit Court No. 65 L 7227) for five parcels of land to be used for school purposes. On July 14, 1965, another petition was filed in the same case seeking nine and one-half acres of unsubdivided land and one acre of subdivided property which consisted of eight lots designated as Parcel 4 and also referred to as Parcel E. On July 14, 1965, another petition was filed in a new case (Circuit Court No. 65 L 20763) seeking the same property. In that case a change of venue was granted on November 3, 1965, as to Parcel 4, and the case reassigned for a separate trial as to Parcel 4. Thereafter the cases were consolidated.

This appeal by petitioner and the cross appeal of Western National Bank of Cicero as Trustee under Trust No. 498 (hereinafter referred to as defendant) emanates from the proceedings in the separate trial as to Parcel 4—also referred to as Parcel E.

In the consolidated case petitioner sought to condemn ten and one-half acres of land located in the vicinity of O'Hare Airport bounded by Cumberland Avenue on the west and Pittsburgh Avenue on the east. Balmoral Avenue was to the south and the city limits (close to Bryn Mawr Avenue) were the northern boundary. Defendant's eight lots fronted on Pittsburgh Avenue each with 58-foot frontage and a depth of 107.48 feet. The evidence showed that the property was zoned R–2, single-family residence, and each lot in the subdivision bore a covenant restricting it to such use.

On appeal petitioner's principal contention is that the conduct of defense counsel in closing argument was so prejudicial as to deny petitioner a fair trial.

PETITIONER'S EVIDENCE

Herman O. Walther testified that he was a real estate appraiser with extensive experience and that he had taught real estate appraising. He said that there were many other areas in the City of Chicago still being developed for houses and that in the immediate vicinity of the subject property, just west of Cumberland Avenue, there were 100 vacant acres and three and one-half miles east of Pittsburgh Avenue there was an only partially developed new home area. He stated that the highest and best use of the eight lots was for single-family residences and that each lot was worth $8,000.

Albert J. Schorsch, Jr. testified under subpoena. He stated that he and his family had been developing property in the area for about ten years, that eighteen months earlier one of the companies in which he and his family were involved sold a lot on the corner of Pittsburgh and Balmoral to another of the Schorsch companies for $9,000 and that this was not an arm's length transaction. He said that the lot was 60 feet wide and 124 feet deep but that the trend was toward building houses on lots 50 feet wide.

Raymond Cleveland stated that he was a real estate broker and that he had recently participated in the sale of a property 48 feet wide and 141 feet deep and within one-half mile of the subject property for the price of $7,500. He said that the lot fronted on Cumberland Avenue across the street from a large shopping center and three or four lots away from a gas station and that the houses in that area sold for between twenty and thirty thousand dollars.

Edwin J. Feulner testified that he was a broker, manager and appraiser of real estate and that he was

268

familiar with the area of the subject property. He said that the highest and best use of the eight lots was R–2 single-family residences and that as such they were worth $140 per front foot ($8,120 for 58-foot frontage).

DEFENDANT'S EVIDENCE

Albert Schorsch, Jr. (who had also been called as a witness by petitioner) testified that his organizations were in competition with defendants and owned the property immediately south of defendant's subdivision. He said that the highest and best use of the subject property would be under R–3 general residence zoning. He then testified:

> Under R–3 zoning you might be able to build one flat on each parcel of 2,500 square feet and on a lot 46½, maybe slightly larger than this, you could build a two flat. You could get nine total units out of that group of 8 lots and if you took into consideration the ownership of adjacent lots you could get 10 lots because all you need is one more front foot to make the 10th lot. I have an opinion of the fair cash market value of 10 such units as of July 15, 1965. I believe each of the units 46½ x 107.48, that each parcel that size would be worth $11,000 which works out to be $220—$225 a front foot. My opinion is the same if the zoning remains the same.

Frank Syms testified that he was an appraiser, broker, manager and financier of land transactions; that an area of land to the east of the subject property separated by one vacant parcel and Pittsburgh Avenue had been developed with homes ranging in value from $30,000 to $45,000 by the Schorsch interests, James C. Moreland and Son and the beneficial owners of the subject property and that there is a relationship between the value of vacant and improved property. He said that the highest and best use was for single-family residences and that

269

each lot would have a value of $10,400 or $179 per front foot or a total of $83,200 for the eight lots. He stated that there was a scarcity of comparable sales because most developers sold property with houses as a complete package.

William F. Moreland stated that he was a broker and developer and was president of the company of James C. Moreland and Son which had developed property in the area. He testified that the highest and best use was single-family residences, that the fair cash value of the eight lots depended on whether their sale was separate or bulk, that the fair cash value was $11,000 to $14,000 per lot or $200 to $225 per front foot.

Raymond Peterson said that he was a builder and sub-divider, that he was involved in a sale within a mile of the subject property, the price was $251.87 per front foot for five lots, all of which were 125 feet deep and four of which were 25 feet wide with the fifth being 38 feet wide. He said there was no longer any vacant property in the immediate area of that sale. He testified that the highest and best use of the subject property was for single-family residences and that the fair cash value for the eight lots would be approximately $11,000 per lot or $220 to $225 per front foot. He admitted on cross-examination that he never walked around the subject property or bought or sold property within two or three blocks of it but that he had only driven by it.

Opinion

■ Petitioner contends that prejudicial conduct of defense counsel in his closing argument so confused and prejudiced the jury that it was denied a fair trial. Walther testified that the eight lots were worth $8,000 per lot. Defense counsel argued to the jury that viewing Walther's testimony of $8,000 per lot with that of witnesses who testified to the possibility of making ten lots out of the property, that "even using Mr. Walther's valuation, the overall picture is $80,000 for this whole

270

parcel." Walther never testified to what the lots would be worth if subdivided into ten smaller lots. Counsel used the same method in discussing the testimony of Feulner, Syms and Peterson who all valued the eight lots as then subdivided.

Petitioner also complains that counsel's argument that property which was sold on Cumberland was not comparable to the subject property because Cumberland is a ". . . high speed street with a rumble strip," was not based on any evidence in the case. The same is said of the argument that the jury should consider the difficulty of defendant's getting new land to continue this construction and development business. Finally, complaint is made of a personal attack on petitioner's counsel.

Defendant, however, argues that the alleged errors are not properly preserved for review. The record shows that not one of the remarks complained of was objected to at the trial. In County of Cook v. Colonial Oil Corp., 15 Ill2d 67, 153 NE2d 844, the court said at page 75:

> Counsel for defendant also characterizes the closing argument of petitioner's counsel as "unfair, insulting, full of ridicule of respondent's witnesses and counsel, and so insinuating and vindictive as to be highly prejudicial to the respondent." First of all, counsel for defendant, who is admittedly experienced in condemnation, made no objection to any of the opening argument of counsel for petitioner and no objection to any of the supposedly objectionable remarks made by petitioner's counsel in his final argument. We have consistently held that experienced counsel cannot take a chance of failing to make objections and then, upon receiving what they consider an adverse jury verdict, claim error. (City of Chicago v. Vaccarro, 408 Ill 587.)

Furthermore, in its post-trial motion the petitioners said only: "The petitioner was prejudiced by the argu-

271

ment made by counsel for defendant to the jury." Illinois Revised Statutes, 1963, c 110, § 68.1, requires that the post-trial motion "contain the points relied upon, *particularly specifying* the grounds in support thereof. . . . A party may not urge as error on review of the ruling on his post-trial motion any point, ground or relief not particularly specified in the motion." (Emphasis supplied.) In Kortlander v. Chicago Transit Authority, 56 Ill App2d 48, 205 NE2d 516, it was held that unless the allegedly improper remarks were specifically set forth in the post-trial motion, no objection could be raised to them on appeal. See Lawler v. Pepper Const. Co., 33 Ill App2d 188, 178 NE2d 687; Perez v. B. & O. R. Co., 24 Ill App2d 204, 164 NE2d 209; Richman Chemical Co. v. Lowenthal, 16 Ill App2d 568, 149 NE2d 351.

In the instant case the verdict was "within the range of the evidence." Chicago Land Clearance Commission v. Darrow, 12 Ill2d 365, 146 NE2d 1. There was evidence that the eight lots were worth $11,000 to $14,000 per lot and that the 464 feet were worth between $200 and $225 per front foot. In fact, in discussing the post-trial motion the trial judge said:

> There isn't any question that this jury valued this property, 464 feet at $210 a foot, which multiplied comes out to $97,440 to the penny. I don't think they ever considered it as ten sites as such. If they did, they would have come out with $9,744 a building site, and juries don't do that.
>
> In my opinion, this verdict is within the realm of the evidence, and I don't think there is, as far as I am able to observe—and I don't think there is any error in the record.

In view of petitioner's uniform failure both to object at the trial and to specify in the post-trial motion, and since the verdict is within the range of the evidence, the judgment is affirmed.

CROSS-APPEAL

Defendant contends in its cross-appeal that its motion to dismiss should have been sustained because (1) the taking was an abuse of the School Board's power in that the proposed site for school purposes was in a flight zone for aircraft using O'Hare Field, and (2) the statutory prerequisites were not fulfilled.

HEARING ON TRAVERSE AND DEFENDANTS' MOTION TO DISMISS

DEFENDANT'S EVIDENCE

Saul Samuels was called by defendant under section 60 [1] and testified that he knew of no schools built within a flight zone in the last four years but that he did not have sufficient information to say that none was built.

Francis B. McKeag, assistant superintendent of schools, testified under section 60 that there would eventually be plans for a school on the site although he did not feel there then existed any specific plans. He said, "We will serve a $\frac{3}{4}$ mile radius from this location in all directions so far as Kindergarten through 6th grade is concerned. $1\frac{1}{4}$ miles as far as 7th and 8th grades are concerned and when a high school is placed on this location it would serve a $1\frac{1}{2}$ mile radius." He stated that the northern boundary of the proposed school site was also the northern boundary of the City of Chicago, that due to the inadequacy of present facilities the Board of Education was forced to pay tuition fees for 120 students from this area to another school system and that this school system had told the board last spring that it would no longer have room for these students. He admitted, however, on cross-examination that a report of the General Superintendent of Schools said that the schools in District 1, the district here involved, were capable of receiving more students.

Joseph P. McMahon, assistant real estate agent of the Board of Education, testified under section 60 that he

---

[1] Ill Rev Stats, 1963, c 110, § 60.

was visited by defendant's lawyer; that he did not know whether the lawyer came in response to the letter containing the offer of purchase; that the lawyer did not present the letter; that he did not tell the lawyer what the offer was; that the lawyer only stated that his people were not happy about it and that he told the lawyer that he (McMahon) had no authority to change the offer.

John Duba, Commissioner of Development and Planning, testified that the Chicago Plan Commission was not consulted on this project.

PETITIONER'S EVIDENCE

Francis B. McKeag testified that because of the decision of the Pennoyer School Board to stop receiving the 120 students from this area, the Chicago Board of Education was forced to place four mobile classrooms on the corner of Balmoral and Cumberland. He said that in the last ten years the city had annexed a considerable amount of territory requiring the acquisition of a school site in the general area.

Frank G. Lappas testified that he was an aeronautical consultant with a degree in civil engineering, that he had been a consultant to companies throughout the nation on matters pertaining to air hazards as well as to property owners planning on the use of land in the vicinity of airports, that he had appeared before the Federal Aviation Agency on numerous occasions, that he had studied the rules and regulations of various bodies having to do with airports throughout the country, and that he was familiar with O'Hare. He stated that there were a variety of safety zones around airfields and that this property was within O'Hare's instrument approach zone but not within the control zone. He said that the subject property was 15,000 feet from the end of the runway and 1,400 feet off the extended center line of the runway and that a two-story building would constitute no hazard and violate no pertinent regulations he knew of.

OPINION

In its cross-appeal defendant first contends that the taking is an abuse of power and the petition should have been dismissed. The general rule is stated in Trustees of Schools of Township 37 North, Range II, Cook County v. Sherman Heights Corp., 20 Ill2d 357, 169 NE2d 800, at page 360:

> The question of necessity for taking by eminent domain for public use is legislative and its determination is within the discretion of the corporate body vested with the power to exercise the right. [Cases omitted.] Such a determination will be disturbed by the courts only where there has been an abuse of power violative of constitutional rights. [Cases omitted.]

Petitioner introduced testimony that ten years of annexation by the City of Chicago had created the need for new school facilities in the area, first met by paying tuition for 120 students in the schools of a nearby community and later by the erection of four mobile classrooms. Defendant, however, says that the school board abused its power in attempting to construct a school in what it terms the "flight zone" around O'Hare Airport when such action is expressly disapproved by the zoning regulations for the Chicago-O'Hare International Airport. Section 2 of these provisions provides:

> Land Use Restriction Zone—In that portion of the approach zone at each end of each instrument and non-instrument runway as indicated on the zoning map, is hereby established an area hereinafter referred to as the land use restriction zone. The land use restriction zone shall have a width of 1,000 feet at a point 200 feet from the end of each runway widening thereafter uniformly to a width of 4,000 feet at *a distance of 10,200 feet* from the end of each

275

runway. Any land use established within the land use restriction zone subsequent to the effective date of these zoning regulations shall be subject to the control of the affected political subdivision. To the extent where feasible, such political subdivision shall discourage further development of residential buildings and places of public assembly involving educational, institutional, amusement, and recreational uses. [Emphasis added.]

The evidence shows that the subject property is 15,000 feet from the end of the runway and therefore outside the land use restriction zone. Moreover, the only testimony on the actual hazards involved was given by petitioner's witness Lappas, an aeronautical consultant, who stated that the placement of a school on the subject property would not constitute a safety hazard and would not violate any regulations he knew of.

■ ■ Defendant also argues that petitioner voluntarily dismissed two prior suits to condemn nearby property because that property was in a "flight zone." Defendant claims that it relied on these actions to its detriment and that petitioner is therefore estopped from taking the subject property citing Hickey v. Illinois Cent. R. Co., 35 Ill2d 427, 220 NE2d 415. Defendant produced a document purporting to be a recommendation of the General Superintendent of Schools that one of the condemnation suits be dismissed because the property to be condemned was in a flight zone. However, there was no evidence whatsoever as to the reason for the dismissal of the other suit. Furthermore, there was no evidence defining a "flight zone" or showing that the subject property in the instant case was within it.[2] Finally, de-

---

[2] The only evidence identifying and explaining the different zones that surround an airport was provided by petitioner's expert, Frank Lappas. He said the "instrument approach zone" was 500 feet on each side of an extended center line of a runway projecting

fendant failed to show that the expenditures it made in improving the property in reliance on these dismissals will not be reflected in the property's value and will be lost to it. In these circumstances we find no basis for the conclusion that petitioner is estopped from taking the subject property. See generally Chicago, St. L. & W. R. Co. v. Gates, 120 Ill 86, 11 NE 527.

Defendants' second contention in their cross-appeal is that petitioner failed to fulfill conditions precedent to the filing of condemnation proceedings. First, defendant argues that there was no good faith attempt on the part of petitioner to negotiate with the landowners and no refusal on their part to agree on a valuation. The general superintendent of Chicago schools sent defendant a letter making an offer of $40,000 for the property. The letter stated that the general superintendent had been empowered by the School Board to negotiate but that if discussion was desired Mr. Fred Arnholt of the Board of Education should be contacted first. Defendants produced evidence only that their lawyer talked to Joseph McMahon of the Board of Education's real estate office, but that he made no counter offer and no request to discuss this with the Superintendent. The lawyer merely said his clients were dissatisfied with the offer, to which Mr. McMahon replied that he had no authority to change it. We believe there was sufficient offer and attempt to negotiate. See County Board of School Trustees of Macon County v. Batchelder, 7 Ill2d 178, 130 NE2d 175; County of Mercer v. Wolff, 237 Ill 74, 86 NE 708.

---

out to 50,000 feet at which point the width of the zone was 16,000 feet and that the subject property fell within this zone. He mentioned but did not define the "non-instrument approach zone." Adjacent to the two zones are "transitional zones." Lappas also stated that there were conical surfaces and outer conical surfaces. He did not testify that any of these above were hazard zones, nor did he mention the term "flight zone."

■ Defendant also contends that the School Board's failure to contact the Chicago Plan Commission before it sought to condemn prevents a valid condemnation. Illinois Revised Statutes, 1965, chapter 24, section 11–12–4.1, reads as follows:

Whenever a municipality of more than 500,000 population has created a plan commission pursuant to the provisions of this Division 12, every plan, design or other proposal by any public body or agency which requires the acquisition or disposition of real property within the territorial limits of the municipality by any public body or agency, . . . shall be referred to the plan commission by such public body or agency not less than 30 days prior to any election for the purpose of authorizing the borrowing of money for, or any action by such public body or agency to appropriate funds for, or to authorize such changes or the acquisition or disposition of such real property, but in no event shall such referral be less than 30 days prior to making such changes or acquiring or disposing of such real property. The plan commission shall review every such plan, design or other proposal and shall within 30 days after submission thereof report to the public body or agency having jurisdiction over such real property or improvement thereon concerning the conformity of the plan, design, or other proposal with the long range planning objectives of the municipality and with the official plan for the municipality or any part thereof if the same shall then be in effect as provided in Section 11–12–2. Such report shall be spread of record in the minutes or record of proceedings of such public body or agency. A report that any such plan, design, or other proposal is not in conformity with the long range planning objectives of the municipality, or the official plan for the municipality shall be accompanied

by a written statement of the respects in which such conformity is lacking but such a report shall not bar the public body or agency having jurisdiction over such real property or improvement thereon from thereafter making such changes or acquiring or disposing of such real property. . . .

The statute expressly provides that the plan commission's disapproval does not bar the proposed action. We believe that the statute taken as a whole indicates that the requirement of submission to the plan commission is not mandatory and failure to submit the proposed action to the commission does not bar condemnation.

██ Defendant asserts the court erred in sustaining petitioner's objections to an interrogatory requesting a list of all persons who were directed by the board to inspect the property. The petitioner claimed that the names were privileged and not subject to disclosure relying on Chicago v. Harrison-Halsted Bldg. Corp., 11 Ill2d 431, 143 NE2d 40 which held that the reports of appraisers were privileged. However, we believe that under the broad discovery principles of Monier v. Chamberlain, 35 Ill2d 351, 221 NE2d 410, the names of appraisers are not privileged. Nevertheless, under the circumstances we deem this to have been a harmless error.

██ Defendant also contends that errors were committed in the pretrial discovery proceedings with regard to the disposition of six answers to defendant's notice to admit facts. Petitioner responded to the questions by denying knowledge sufficient to answer the questions and at the same time asserting that they were irrelevant and immaterial. Defendant complains that its motion to strike those parts of petitioner's answers asserting that the questions were irrelevant and immaterial was erroneously denied. Supreme Court Rule 216, Illinois Revised Statutes, 1965, chapter 110A, section 216, formerly Rule 18, requires that the questions be either answered or objected

to or that an explanation of why they cannot be answered must be given. Petitioner should not have been able to both answer and object simultaneously to the same matter. The motion to strike those portions of the answers which amounted to objections should have been granted. However, this error could not prejudice defendant and cannot be the basis of a reversal.

 Defendant also urges that those portions of the answers asserting inability to answer were specious and not made in good faith and that denial of its motion that petitioner be deemed to have admitted answers favoring the movant was error. We sympathize with petitioner's inability to answer some of these questions because the maps provided by defendant fail to show what defendant asserted they showed and did not contain the material necessary to answer the questions. Furthermore, failure to deem these answers admissions could not have substantially prejudiced defendant's case. Some of the questions dealt with whether the subject property and other property which had been the subject of condemnation suits were within an instrument approach zone within the meaning of the 1965 Revised Code of Federal Regulations, Title 14, c 1, § 77.27. The evidence ultimately showed that these properties were within the zone. Thus failure to deem these facts as admitted could have had no prejudicial effect. See Braswell v. New York, C. & St. L. R. Co., 60 Ill App2d 120, 208 NE2d 358. Moreover, section 77.27 does not characterize these zones as hazard zones and has no bearing on the case. (Section 77.23 entitled "Standards for Determining Obstructions" defines hazard areas. There was no showing that this property was within a hazardous area either under section 77.23 or the O'Hare Zoning Regulation, supra.) The remaining questions were also substantially answered by the evidence but again failed to have any significant bearing on important issues in the case. Failure to deem these answers admissions was not reversible error.

Finally, we find no error in the trial court's refusal to direct an answer to a question propounded during a discovery deposition.

In view of the foregoing, the judgment of the Circuit Court is affirmed.

Affirmed.

McCORMICK, P. J. and ENGLISH, J., concur.